## AFFIDAVIT IN SUPPORT OF
## APPLICATIONS FOR SEARCH WARRANTS

I, Abigail L. Tarwater, Special Agent ("SA") of the Drug Enforcement Administration ("DEA"), being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), and have been since October 2018. I am currently assigned to the DEA's Kansas City District Office. I am a federal law enforcement officer within the meaning of Federal Rule of Federal Procedure 41. I have received specialized training at the DEA Academy, Quantico, Virginia, in conducting illicit drugs investigations, including but not limited to: drug interdiction, identification, distribution of drugs, undercover operations, asset forfeiture, use of confidential sources, and the legal aspects of conducting drug investigations. Prior to my assignment with the DEA, I worked as a Police Officer for the Kansas City, Missouri Police Department ("KCPD") from approximately August 2017 until May 2018.

2.      In connection with my official duties, I investigate criminal violations, to include, without limitation, 21 U.S.C. §§ 841, 843, and 846; and 18 U.S.C. §§ 922 and 924. My training and experience has involved physical surveillance, execution of search warrants, arrests of countless drug traffickers, and the handling of cooperating sources and sources of information. During my tenure with the DEA, I have communicated extensively with other state and federal law enforcement personnel who specialize in drug and firearm investigations. I also have extensive experience in debriefing defendants, participating witnesses, informants, and other persons who have personal experience and knowledge with regard to various drug- and firearm-related crimes.

1

3.     Through my training and experience in the investigation of firearm and controlled substance offenses and through interaction with other law enforcement officers who investigate such offenses, I know the following:

a.     that individuals involved in trafficking contraband firearms and controlled substances maintain books, records, receipts, notes, correspondence, ledgers, and other records, relating to the transportation, ordering, and/or distribution of said items, even though sometimes in code, and such individuals commonly "front" (deliver on consignment) firearms and controlled substances and maintain such records in doing so;

b.     that it is common practice for those involved in distributing contraband firearms and controlled substances to secret contraband, proceeds of sales, and records of transactions in secure locations within their residence, or other property including storage units or safe deposit boxes, for ready access and/or to conceal them from law enforcement authorities;

c.     that persons involved in trafficking contraband firearms and controlled substances conceal in their residences or other property caches of said items, large amounts of currency, financial instruments, and other assets of value which are the proceeds of transactions; and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money related to engagement in trafficking activities; that persons involved in trafficking often purchase substantial assets including cars, boats, and homes with the proceeds of transactions in manners to conceal the true source of the funds; and that courts have recognized that unexplained wealth is probative as evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

2

      d.      that persons engaged in distributing controlled substances maintain on the premises, paraphernalia for packaging, cutting, weighing, and distributing controlled substances, and equipment used in the packaging, weighing, and otherwise preparing for the distribution of controlled substances;

      e.      that persons engaged in distributing both contraband firearms and controlled substances maintain on the premises addresses and telephone numbers in books or papers and in contact lists in cell phones which reflect the names, addresses, and/or telephone numbers for their sources, customers, and associates related to their trafficking activities, even though sometimes in code;

      f.      that persons engaged in trafficking contraband firearms and controlled substances maintain on the premises digital photographs and/or videos of co-conspirators, associates, assets, and controlled substances;

      g.      that persons involved in trafficking contraband firearms and controlled substances keep and maintain personal firearms to protect themselves and their assets from those who would seek to rob or steal their assets from them; and

      h.      that persons who engage in trafficking contraband firearms and controlled substances utilize cell phones and other communication devices in order to store contact lists, share images/videos of their products, and to arrange for delivery and distribution of said items.

4.      Based upon my training and experience, I am aware that persons involved in distributing controlled substances commonly keep and maintain firearms to protect themselves and their inventory from other drug traffickers and from apprehension by law enforcement officers.

The possession of firearms by individuals in the drug trade therefore furthers their distribution of controlled substances.

5.      Based on my training and experience, I know that drug trafficking at the retail level is largely a cash business. I know that drug traffickers often generate large amounts of unexplained wealth, and through financial transaction, attempt to conceal, disguise or legitimize unlawful proceeds through domestic and international banks and their attendant services, securities brokers, professionals, such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency. In addition, drug traffickers often use drug proceeds to purchase additional narcotics to perpetuate and promote the ongoing conspiracy. I know that drug traffickers often use mobile phones and communication applications on such devices to communicate with co-conspirators in furtherance of their money laundering activities.

6.      The facts in this affidavit are based on my own investigation and information provided to me by other law enforcement officers. Because this affidavit is submitted for the limited purpose of establishing probable cause to search the locations further described in **Attachments A1–A7** for the items listed in **Attachments B1–B4**, not all of the information known to me about this investigation has been included in this affidavit.

## PURPOSE OF AFFIDAVIT

7.      This affidavit is submitted in support of applications for warrants authorizing the search of multiple locations and vehicles in the Western District of Missouri. A single affidavit is presented for all locations and vehicles to more properly set forth all relevant information. The

4

locations sought to be searched and their descriptions are as follows, and are collectively referred to herein as the **Target Structures**:

a. **10929 Bales Avenue, Kansas City, Missouri** (hereinafter **Target Residence #1**, further described in **Attachment A1**);

b. **5117 East 40th Terrace, Kansas City, Missouri** (hereinafter **Target Residence #2**, further described in **Attachment A2**);

c. **2611 East 68th Street, Kansas City, Missouri** (hereinafter **Target Structure #3**, further described in **Attachment A3**).

8.    The vehicles sought to be searched and their descriptions are as follows, and are collectively referred to herein as the **Target Vehicles**:

a. **2020 black Volkswagen Passat, bearing Missouri license plate EH8X9M** (hereinafter **Target Vehicle #1**, further described in **Attachment A4**);

b. **2019 black Ford F-150 Platinum Edition, bearing Missouri license plate 5CFW89** (hereinafter **Target Vehicle #2**, further described in **Attachment A5**);

c. **2013 silver Ford Escape, bearing Missouri license plate GA5U3D** (hereinafter **Target Vehicle #3**, further described in **Attachment A6**).

d. **2011 cream Buick Lucerne, bearing Missouri license plate JJ2U0A** (hereinafter **Target Vehicle #4**, further described in **Attachment A7**)

9.    I am seeking to search the **Target Structures and Target Vehicles** for the items listed in **Attachments B1–4**. I am seeking evidence related to violations of 21 U.S.C. §§ 841(a)(1) and 846, that is, distribution of controlled substances, possession with the intent to distribute controlled substances, and conspiracy to distribute controlled substances; 21 U.S.C. § 843(b), that

is, use of a communication facility to facilitate a drug trafficking crime; 18 U.S.C. § 922(g)(1),
that is, felon in possession of a firearm; 18 U.S.C. § 924(c), that is, possession of a firearm in
furtherance of a drug trafficking crime or crime of violence; 18 U.S.C. § 1956(h), that is,
conspiracy to commit money laundering; and 18 U.S.C. §§ 2 and 371, that is, aiding and abetting
and conspiracy to commit the foregoing offenses.

10.     Based upon the facts set forth herein, I have probable cause to believe that a search
of the **Target Structures** and **Target Vehicles** will lead to evidence of violations of 21 U.S.C. §§
841(a)(1), 843(b), and 846; and 18 U.S.C. §§ 2, 371, 922(g)(1), 924(c), and 1956(h), as well as the
identification of individuals who are or have been engaged in the commission of those crimes.

## PROBABLE CAUSE

11.     In October 2021, law enforcement initiated an investigation into the drug trafficking
activities of **Charles HILL ("C. HILL")** and the DTO after receiving information that **C. HILL**
was trafficking a large quantity of PCP throughout the Kansas City metropolitan area.

12.     On October 15, 2021, investigators with the KCPD Drug Investigation Section
received information from a Confidential Source ("CS#1") [1] that an individual referred to by the
alias "Chuck Wagon"[2] was trafficking PCP in the Kansas City area. CS#1 advised investigators
that Chuck Wagon worked for "the city" and lived in a residence that was geographically located
"out south." CS#1 provided investigators with Chuck Wagon's cellular telephone number: (816)
269-2914 ("**Target Telephone #1**"). CS#1 advised investigators that Chuck Wagon utilized

---

[1] CS#1 agreed to provide information in return for consideration of deferment of future charges related to his/her involvement in the DTO. Later in the investigation, CS#1 conducted unauthorized PCP transactions and was subsequently deactivated and no longer utilized in furtherance of the investigation.
[2] After interviewing CS#1 and conducting a variety of investigative techniques, investigators discovered that "Chuck Wagon" was an alias for **C. HILL**. During the interview of CS#1, he/she consistently referred to **C. HILL** as "Chuck Wagon." Therefore, I utilized the alias "Chuck Wagon" when recounting statements provided by CS#1.

**Target Telephone #1** to facilitate sales of PCP. CS#1 further advised investigators that Chuck Wagon drove numerous vehicles, including a black Chevrolet Tahoe and a newer gray car, which was potentially procured from a rental company.

13.     CS#1 told investigators that "Chuck Wagon's girl"—which investigators understood to mean his female romantic partner—was employed at the Gines Dry Cleaning and Alterations and Laundry business (hereinafter "Gines Dry Cleaning"), located at 3720 East 31st Street, Kansas City, Missouri. CS#1 advised investigators that, if a customer contacted **Target Telephone #1** and wanted to purchase PCP from Chuck Wagon while he was working at his place of legitimate employment, Chuck Wagon would direct the customer to meet his female romantic partner, who provided PCP to his customers in his absence. CS#1 advised investigators that Chuck Wagon's female romantic partner would either conduct PCP sales in the parking lot of Gines Dry Cleaning or travel to meet customers in the parking lots of nearby businesses.

14.     CS#1 advised investigators that, in order for Chuck Wagon to prepare for potential PCP sales, he (Chuck Wagon) was typically in possession of a large bag filled with PCP vials. CS#1 advised investigators that Chuck Wagon sold one vial of PCP in exchange for approximately $200 of United States currency ("USC"). CS#1 further advised that, if a customer purchased two vials of PCP versus a single PCP vial, Chuck Wagon would offer a discounted price of $300 of USC.

15.     Investigators input the number for **Target Telephone #1** into a law enforcement database, which revealed that **C. HILL** had been associated with **Target Telephone #1** during a prior law enforcement encounter. Further analysis revealed that **C. HILL** was linked with a female associate: **Kessa GINES**. Via a subsequent open source search, investigators located a marriage

7

certificate for **C. HILL** and **GINES**, which indicated the couple had been married in Clay County, Missouri, on September 24, 2016.

16.     Additional database searches indicated that **C. HILL** was associated with an address of **10929 Bales Avenue, Kansas City, Missouri ("Target Residence #1")**.[3] During subsequent surveillance of this address, investigators observed three vehicles parked in the driveway: a black Chevrolet Tahoe (the same color, make, and model of vehicle that CS#1 previously advised investigators that Chuck Wagon drove), bearing Missouri license plate RA9L4E; a silver Volkswagen Passat, bearing Missouri temporary license 05QBRS; and a silver Ford Escape, bearing Missouri license plate GA5U3D **("Target Vehicle #3")**. A search of the Missouri Department of Revenue database revealed that all three vehicles were registered to **GINES**. During subsequent surveillance operations conducted at the residence, both **C. HILL** and **GINES** were observed leaving the residence in the morning hours, confirming investigators' belief that both subjects reside at that address.

17.     Beginning on November 2, 2021, and continuing through March 19, 2022, investigators met with CS#1 to conduct controlled purchases of PCP from **C. HILL**[4]. In total, there were six separate purchases from **C. HILL** beginning on November 2, 2021, and continuing

---

[3] This address is located in the southern region of Kansas City, Missouri. The geographic location of **C. HILL's** residence therefore corroborates CS#1's statements to investigators that **C. HILL** lives "out south."

[4] Prior to each controlled purchase outlined herein, investigators first met with the CS at a pre-determined briefing location, searched the CS and his/her vehicle for illicit drugs, money, weapons, and/or other contraband (with negative results in each instance), provided the CS with KCPD Official Advanced Funds, and equipped the CS with an audio transmitting/recording device. In each instance, investigators followed the CS to and from the buy location and maintained surveillance throughout the transaction. Following each transaction, investigators followed the CS to a pre-determined debriefing location, where investigators took custody of the purchased narcotics and searched the CS and his/her vehicle again for contraband (with negative results in each instance). The narcotics and recordings from the audio transmitting/recording device were recovered as evidence.

8

through March 19, 2022.[5] Each purchase was arranged through a phone call from CS #1 to **C. HILL** over **Target Telephone #1**, and each purchase occurred within the Kansas City metropolitan area and within the Western District of Missouri. Each of the six purchases arranged by CS #1 resulted in **C. HILL** providing two half-ounce vials of PCP in exchange for $300 in USC.

18.     Additional controlled purchases were conducted from **C. HILL** and other members of the DTO subsequent to those six initial purchases, as described in further detail below. On November 14, 2022, investigators received an anonymous tip from the Greater Kansas City Crime Stoppers. The tipster provided information that **Raven HICKS** was selling PCP and "other drugs" out of a residence at 2411 Spruce Avenue, Kansas City, Missouri. The tipster further provided telephone number (816) 447-2365 as the contact number for **HICKS**. Investigators subsequently issued an administrative subpoena to T-Mobile USA, which revealed that **Raven HICKS**, with an address of 2411 Spruce Avenue, Kansas City, Missouri 64127 (the same address provided by the tipster), was the account subscriber/customer name for the telephone number listed in the tip. Investigators successfully confirmed much of the information contained within the tip. Following receipt of this tip, CS#1 was contacted in an effort to further corroborate the information. CS#1 confirmed where **HICKS** resided and told investigators that **HICKS** sells PCP.

19.     On January 4, 2023, investigators met with CS#1 to conduct a controlled purchase of PCP from **HICKS**. At the direction of investigators, CS#1 went to **HICKS's** residence at 2411 Spruce Avenue, where he/she contacted **HICKS**. However, CS#1 left shortly after arriving at the

---

[5] The purchase on December 14, 2021, was arranged by CS #1 with **C. HILL**, but the two half-ounce vials of PCP were delivered by **GINES** to CS #1. The five other purchases were arranged by **C. HILL** and executed by **C. HILL**.

9

residence and met back up with investigators. CS#1 informed investigators that **HICKS's** source of supply was currently unavailable due to his work schedule, and **HICKS** had instructed CS#1 to return to the residence after 4:00 p.m.

20.     At approximately 4:12 p.m., CS#1 returned to **HICKS's** residence and once again made contact with **HICKS** inside the house. Subsequent toll analysis revealed that, at approximately 4:14 p.m., the phone number associated with **HICKS** (*i.e.*, (816) 447-2365, as explained above) called **Target Telephone #1**. **Target Telephone #1** then called **HICKS** back at that number at approximately 4:21 p.m.

21.     Around the time that **Target Telephone #1** called **HICKS**, at approximately 4:21 p.m., investigators surveilling **HICKS's** residence observed a silver Ford Escape bearing Missouri license GA5U3D **(Target Vehicle #3)**—which is registered to **GINES** and was driven by **C. HILL** during prior transactions—pull up in front of the residence. Investigators were able to positively identify **C. HILL** as the driver of **Target Vehicle #3**. Investigators then observed **HICKS** exit the residence and conduct what, based upon their training and experience, appeared to be a hand-to-hand transaction with **C. HILL** inside of **Target Vehicle #3**. Following the transaction, **C. HILL** drove away, and **HICKS** went back inside the house.

22.     Shortly thereafter, at approximately 4:25 p.m., CS#1 exited the residence and met with investigators at a pre-determined location. CS#1 provided investigators with two half-ounce vials of PCP, which CS#1 had purchased from **HICKS** in exchange for $300 in USC. CS#1 confirmed that the driver of **Target Vehicle #3** had delivered the PCP to **HICKS**.

23.     On February 14, 2023, investigators met with CS#2[6] in order to discuss PCP distribution in the Kansas City metropolitan area. During the interview, CS#2 advised investigators that one of his/her family members uses PCP on a regular basis. CS#2 advised investigators that, on occasion, CS#2 delivered PCP to his/her family member, due to that family member's physical limitations. CS#2 advised investigators that his/her family member's PCP source of supply was referred to as "Chuck," which investigators recognized as an alias for **C. HILL**. CS#2 advised investigators that Chuck commonly drove either a silver Ford Escape or a black Ford F-150 pickup truck. CS#2 advised investigators that Chuck typically dressed in a gray or blue outfit, which led CS#2 to speculate that Chuck worked as a city employee.

24.     On February 21, 2023, investigators met with CS#2 to conduct a controlled purchase of PCP from **C. HILL**. During the conversation over **TARGET TELEPHONE #1**, CS#2 advised **C. HILL** that he/she had "50 cents" to purchase PCP. In response, **C. HILL** told CS#2 to go to "the Cleaners." Following the conclusion of the call, CS#2 advised investigators that **C. HILL's** reference to "the Cleaners" was synonymous with the dry cleaning business located at East 31st Street and Cleveland Avenue, in Kansas City, Missouri. Investigators followed CS#2's vehicle to the area of Gines Dry Cleaning, where additional investigators had established surveillance. Following CS#2's arrival, he/she dialed **Target Telephone #1** again to speak with **C. HILL**.

---

[6] On or about February 14, 2023, a second confidential source of information ("CS#2") provided investigators with information concerning the drug trafficking activities of **C. HILL** and the DTO. CS#2 displayed firsthand knowledge of **C. HILL**, who CS#2 identified as a long-term PCP source of supply for CS#2's family member. CS#2 agreed to continue to provide investigators with pertinent information related to the DTO and further agreed to make controlled purchases of PCP from **C. HILL**. CS#2 willingly cooperated with law enforcement and was not arrested pursuant to this investigation. CS#2 was motivated to assist law enforcement because a close family member of CS#2 is a regular customer of **C. HILL's**, and CS#2 no longer wants his/her family member to have access to PCP as he/she feels it is detrimental to the family member's health.

11

25.     Approximately five minutes later, via electronic surveillance, investigators observed **GINES** approach CS#2's vehicle, where CS#2 remained seated. Investigators observed **GINES** contact CS#2, and then go open the driver's side door of her (**GINES's**) Volkswagen Passat (**"Target Vehicle #1"**). Investigators observed **GINES** sit down in **Target Vehicle #1's** driver's seat, then exit the car, go back over to CS#2, and hand him/her an item. During the controlled purchase, CS#2 purchased one partially full vial of purported PCP from **GINES** in exchange for $50 in USC.

26.     On March 7, 2023, investigators met with CS#2 to conduct another controlled purchase of PCP from **C. HILL**. During CS#2 and **C. HILL's** initial telephone conversation, **C. HILL** advised CS#2 that he (**C. HILL**) would not be finished with his legitimate job until 3:30 p.m. At approximately 5:00 p.m. that day, investigators re-established surveillance at Gines Dry Cleaning, and again met with CS#2.

27.     Investigators followed CS#2's vehicle to the area of Gines Dry Cleaning, and CS#2 parked in the parking lot. Via pole camera footage, investigators observed **Target Vehicle #1** pull into the parking lot and back into a spot on the west side of the lot. Investigators observed CS#2 contact the occupants of **Target Vehicle #1** through the front passenger's side window. Investigators then observed CS#2 return to his/her vehicle, and both CS#2 and **Target Vehicle #1** left the parking lot. During the controlled purchase, CS#2 purchased one partially full vial of purported PCP from **C. HILL** in exchange for $50 in USC.

28.     Following the transaction, CS#2 advised investigators that the individual he/she knew as Chuck—identified by investigators as **C. HILL**—had been the driver of **Target Vehicle #1**. CS#2 further advised that the same female from the prior transaction—identified by

12

investigators as **GINES**—was the passenger. CS#2 advised that, after he/she provided **C. HILL** the money, **C. HILL** poured part of a full PCP vial into an empty vial and provided it to CS#2. CS#2 further advised that he/she had contacted the occupants of **Target Vehicle #1** after **C. HILL** provided narcotics to another customer in a different car.

29.     On May 15, 2023, the Honorable Roseann Ketchmark, United States District Judge, Western District of Missouri, signed an order authorizing the initial interception of wire and electronic communications over **Target Telephone #1** for a period of 30 days (order number 23-WT-00001-RK).

30.     On May 18, 2023, at approximately 7:47 p.m., investigators intercepted an incoming telephone call from **Russell SPENCER** via his assigned cellular telephone number, **Target Telephone #3** to **C. HILL** on **Target Telephone #1**. An excerpt of the telephone conversation is detailed below:

| | |
|---|---|
| **C. HILL**: | Wassup fool? |
| **SPENCER**: | What's up fool, what's going on witchu? |
| **C. HILL**: | Shit. Moving around… Wassup witchu? |
| **SPENCER**: | I ain't doin nothing. Shit, shit… |
| **C. HILL**: | What you… [voices overlap] |
| **SPENCER**: | Probably tryin to run into you. Tryin to run into you. |
| **C. HILL**: | About to go grab something to eat real quick, I'mma call you when I get through with that. |
| **SPENCER**: | Alright, how long, yeah, make sure you do, man. |
| **C. HILL**: | What'd you say? |
| **SPENCER**: | Aww, I said make sure you do. |

13

| | |
|---|---|
| **C. HILL**: | Yeah. |
| **SPENCER**: | Seriously though. |
| **C. HILL**: | Yessir. |
| **SPENCER**: | Alright. |

31.     Based on my training, experience, and knowledge of this investigation, I believe that **SPENCER** wished to conduct an in-person PCP-related meeting with **C. HILL** when he said he was "tryin to run into you." I know that drug distributors will meet with their suppliers to procure illicit products, pay the suppliers, and conduct in-person meetings to avoid being intercepted by law enforcement. I also know that drug distributors sometimes conduct meetings with their suppliers later in the evening to make it harder for law enforcement observation. I believe that the interaction between **C. HILL** and **SPENCER** was related to drug distribution because **SPENCER** was adamant about meeting **C. HILL**, especially at a later hour of the evening.

32.     Based on that telephone conversation, at approximately 8:12 p.m., investigators established surveillance in the areas of **SPENCER's** residence, located at 5117 East 40th Terrace, Kansas City, Missouri **(Target Residence #2)**.

33.     At approximately 8:57 p.m., investigators intercepted an incoming telephone call from **SPENCER** on **Target Telephone #3** to **C. HILL** on **Target Telephone #1**. An excerpt of the telephone conversation is detailed below:

| | |
|---|---|
| **C. HILL**: | I'm at the house. |
| **SPENCER**: | Okay, here I come bro. |

14

34.    Based on my training, experience, and knowledge of this case, I believe that **C. HILL** was letting **SPENCER** know that **C. HILL** was at **Target Residence #1** and ready to conduct an in-person PCP-related meeting when he said, "I'm at the house."

35.    At approximately 9:14 p.m., investigators established surveillance in the area of **Target Residence #1**. At approximately 9:18 p.m., investigators received a GPS location for **Target Telephone #1**, which corroborated the fact that **Target Telephone #1**, and subsequently **C. HILL's** person, were currently located within a radius that encompassed **Target Residence #1**. At approximately 9:21 p.m., investigators observed a black Dodge Durango pull out of a driveway near **Target Residence #2** and proceed eastbound on 40th Terrace. Investigators lost sight of the vehicle for a few moments once it left the block.

36.    At approximately 9:26 p.m., investigators reacquired sight of the black Dodge Durango, bearing Louisiana license plate N598462, as it was traveling southbound on Interstate-435. Investigators followed the Dodge Durango until it reached **C. HILL's** residence, **Target Residence #1**.

37.    At approximately 9:36 p.m., investigators intercepted an incoming telephone call from **SPENCER** on **Target Telephone #3** to **C. HILL** on **Target Telephone #1**. An excerpt of the telephone conversation is detailed below:

> **C. HILL**:    What's up fool?
>
> **SPENCER**:    I'm out… outside, bro.

38.    Based on my training, experience, and knowledge of this case, I believe that **SPENCER** was letting **C. HILL** know that he had arrived at **Target Residence #1** to conduct the in-person PCP-related meeting when he said "I'm out… outside, bro."

15

39.     At approximately 9:39 p.m., investigators observed an individual outside of the black Dodge Durango. At approximately 9:50 p.m., investigators observed the Dodge Durango's brake lights turn on. Approximately one minute later, investigators observed the Dodge Durango depart from the location. Investigators were able to follow the Dodge Durango until it pulled into the driveway of **SPENCER's** residence, **Target Residence #2**, and ultimately parked behind the residence and out of sight.

40.     A later query of the Louisiana Department of Revenue vehicle files revealed the license plate affixed to the Dodge Durango was registered to Enterprise. Investigators contacted Enterprise and learned that **SPENCER** rented the Dodge Durango from the Houston, Texas, airport ("IAH") Enterprise location on May 6, 2023. The Enterprise rental records revealed **SPENCER** rented the vehicle until May 27, 2023, and that the Dodge Durango was scheduled to be returned to the Houston, Texas, airport Enterprise location. The Enterprise rental information contained **SPENCER's** date of birth, as well as a telephone number ((816) 258-4374) and address (5443 Lydia Avenue, Kansas City, Missouri).

41.     Based on the intercepted conversations and surveillance observations, I believe that **SPENCER** traveled in the Dodge Durango from **Target Residence #2** to **Target Residence #1** in order to conduct a PCP-related meeting.

42.     On May 25, 2023, at approximately 7:52 a.m. **C. HILL**, via **Target Telephone #1**, received a text message from **Dorothea CAIN**, which consisted of "Omg hello."

43.     At approximately 8:46 a.m., **C. HILL**, utilizing **Target Telephone #1**, called **CAIN**. During the ensuing conversation, **CAIN** confirmed she was to go "to the spot."

16

44.     Based on my training, experience, and knowledge of this investigation, I believed **C. HILL** and **CAIN** were referring to the Gines Dry Cleaning business, located at 3720 E. 31st Street, Kansas City, Missouri when they referenced the "spot."

45.     At approximately 10:48 a.m., **C. HILL**, via **Target Telephone #1**, received a text message from **CAIN**, which consisted of, "Call me asap."

46.     At approximately 11:40 a.m., investigators observed **CAIN** just west of the intersection of 10th Street and Prospect Avenue in Kansas City, Missouri. She appeared to be in a wheelchair with numerous other people around her. There was also a white Audi with a Missouri temporary permit of 06P5DR parked near her location with an unknown male reclining in the driver's seat.

47.     At approximately 12:21 p.m., **C. HILL**, via **Target Telephone #1**, received two text messages from **CAIN**, which consisted of "Pulling up," and "6 min."

48.     At approximately 12:31 p.m., via pole camera footage, investigators observed the white Audi with a Missouri temporary permit of 06P5DR, pull into the parking lot and back into a parking spot on the west side of the Gines Dry Cleaning business. After the vehicle parked, **CAIN** exited the front passenger seat of the vehicle, walked around the parking lot for a few moments, then got back into the front passenger seat.

49.     At approximately 12:32 p.m., **C. HILL**, via **Target Telephone #1**, received two text messages from **CAIN**, which consisted of "Here," and "White *vehicle emoji*."

50.     At approximately 12:38 p.m., **C. HILL**, via **Target Telephone #1**, received a text message from **CAIN**, which consisted of "Hello I'm here."

17

51.     At approximately 12:47 p.m., **C. HILL**, via **Target Telephone #1**, received a text message from **CAIN**, which consisted of "Wats up bro it's *fire emoji* out here."

52.     At approximately 12:53 p.m., via pole camera footage, investigators observed **GINES** walk into view from the direction of the drycleaners. She approached the Audi's driver side window and appeared to conduct a hand-to-hand transaction through the open window. She then walked over to **Target Vehicle #1** and got into the driver's seat for a few moments. She then got back out and walked back over to the Audi. As she did so, her left hand appeared to be clenched around an object consistent with the size of a half-ounce vial. **GINES** reached into the driver's window of the Audi with her left hand, appeared to conduct a second hand-to-hand transaction, and then walked away from the vehicle. The Audi left the parking lot at 12:56 p.m. Based on my training, experience, and knowledge of this investigation, I believe **GINES** collected some amount of USC from the Audi's driver, then retrieved a vial of PCP from **Target Vehicle #1** and handed that vial to the driver of the Audi.

53.     On June 7, 2023, at approximately 4:14 p.m., **C. HILL**, via **Target Telephone #1**, received a phone call from **Anita TIMLEY**. An excerpt of the intercepted telephone call is set forth below:

| | |
|---|---|
| **TIMLEY**: | Hello? |
| **C. HILL**: | Say, what's up [Unintelligible]? |
| **TIMLEY:** | Nothin'. Where you at? |
| **C. HILL**: | About to pull up at the Cleaners. |
| **TIMLEY:** | A'righty! Okay, I'm gonna be uh, twenty dollars 'cause they went and spent [Unintelligible] getting [Unintelligible] for me. |
| **C. HILL**: | That's all good. I'll be up here. Pull up on me. |

18

**TIMLEY:**     Bye.

**C. HILL:**     Yep [Clears throat]

54.     During the ensuing conversation, **C. HILL** advised **TIMLEY** that he was preparing to enter the Gines Dry Cleaning ("the Cleaners") parking lot. Subsequently, I believed **TIMLEY** informed **C. HILL** that she had "twenty dollars" to spend on a PCP product. The price of $20.00 is indicative of a purchase price of two More brand cigarettes dipped in PCP. **C. HILL** advised $20.00 would be a sufficient purchase price and ultimately directed **TIMLEY** to also enter the Gines Dry Cleaning parking lot. Based on my training, experience, and knowledge of this investigation, I believe that **C. HILL** was instructing **TIMLEY** to respond to the Gines Dry Cleaning business to conduct a PCP transaction.

55.     At approximately 4:27 p.m., via pole camera footage, investigators observed a black Nissan Murano, with a bronze front passenger door, bearing a Kansas license of 640MRJ, pull into the parking lot of the Gines Dry Cleaning business and back into a parking spot. The occupants remained in the vehicle.

56.     At approximately 4:43 p.m., **C. HILL**, via **Target Telephone #1**, received a text message from **TIMLEY** which said "N**** wya it's hot." Based on my training, experience, and knowledge of this investigation, I believe **TIMLEY** inquired about **C. HILL's** location and subsequent arrival time ("Wya" meaning "where you at") because the Gines Dry Cleaning parking lot was filling up with vehicles that contained possible legitimate and illegitimate customers ("it's hot").

57.     At approximately 4:48 p.m., via pole camera footage, investigators observed **C. HILL** arrive, operating his black Ford F-150 platinum edition pick-up truck, bearing Missouri

license plate 5CFW89 **("Target Vehicle #2")**. As soon as he backed into a parking spot, the driver of the Murano, believed to be **TIMLEY**, exited her vehicle and made contact with **C. HILL** at the driver's window of **Target Vehicle #2**. **TIMLEY** almost immediately returned to her own vehicle and left the parking lot at approximately 4:51 p.m.

58.     Investigators followed the Murano to Tony's Market, located at 3900 E. 31st Street, Kansas City, Missouri. **TIMLEY** entered the convenience store for a few moments, then returned to her car. Investigators then followed the Murano back to the parking lot of the Gines Dry Cleaning business.

59.     At approximately 4:53 p.m., via pole camera footage, investigators observed the Murano pull back into the parking lot and back in next to **C. HILL**, who remained in **Target Vehicle #2**.

60.     Using an unmanned aerial vehicle ("UAV"), investigators observed **TIMLEY** exit the driver's seat of the Murano and make contact with **C. HILL** in the driver's seat of **Target Vehicle #2**. **TIMLEY** handed **C. HILL** a red package, consistent with a package of More brand cigarettes. After a few moments, **C. HILL** handed **TIMLEY** a bundle of what appeared to be several brown cigarettes, consistent with More brand cigarettes. **TIMLEY** then returned to the Murano and the vehicle left the location at approximately 4:57 p.m. Based on my training, experience, and knowledge of this investigation, after reviewing the phone call, text message, and pertinent recorded surveillance video, along with discussing personal observations, I believe that **C. HILL** and **TIMLEY** coordinated a PCP narcotics transaction by using both phone calls and text messages to **Target Telephone #1**. I believe that **C. HILL** requested that **TIMLEY** go to the Tony's Market to purchase a package of More brand cigarettes for him. **C. HILL** then sold

20

**TIMLEY** several PCP dipped More brand cigarettes from the new package, after dipping them in a vial of PCP.

61.     On June 15, 2023, the Honorable Roseann Ketchmark, United States District Judge, Western District of Missouri, signed an order authorizing the renewed interception of wire and electronic communications over **Target Telephone #1**, and the initial interception of wire and electronic communications over **C. HILL's** secondary assigned cellular telephone number (816-877-4323), **Target Telephone#2,** for a period of 30 days (order number 23-WT-00003-RK).

62.     On June 20, 2023, at approximately 9:14 a.m., **C. HILL**, via **Target Telephone #1**, received a phone call from **SPENCER**, on **Target Telephone #3**. During the ensuing conversation, **C. HILL** informed **SPENCER** that he (**C. HILL**) would call **SPENCER** when he got off work. **SPENCER** informed **C. HILL** that he was "waitin' on you" and the conversation was terminated.

63.     At approximately 3:20 p.m., GPS location data of **SPENCER's** phone placed the device near 55th Street and Lydia Avenue, Kansas City, Missouri. Investigators knew **SPENCER** was associated to 5443 Lydia Avenue, so surveillance crews moved to that area and located **SPENCER's** cream-colored Buick Lucerne (**Target Vehicle #4**), bearing Missouri license JJ2U0A, parked directly in front of the residence. Shortly after obtaining sight of **Target Vehicle #4**, **SPENCER** was observed briefly as he approached **Target Vehicle #4**, from the direction of the residence. He then walked back out of sight toward the house.

64.     At approximately 6:57 p.m., **C. HILL**, via **Target Telephone #1**, received a call from **SPENCER**, on **Target Telephone #3**. During the ensuing call, it was apparent there had

21

been some miscommunication regarding who was going to initiate contact that afternoon. The

following is an excerpt from the conversation:

> **SPENCER**:  Nah, nah, we gotta, I need I'm, I'm, I'm, I've got something, I've got something up my sleeve.
>
> **C. HILL**:  No shit. Where you at with it?
>
> **SPENCER**:  I'm over here where Jesse [PHONETIC] Mae [PHONETIC] used to live.
>
> **C. HILL**:  No shit. I'm over here, uh, I'm about to drop this n**** Cherry off real quick.
>
> **SPENCER**:  Call me as soon as you do that, man.
>
> **C. HILL**:  Alright, I got you.

65.     After hearing this conversation, though it was once again apparent **SPENCER** and

**C. HILL** were speaking in a manner that would make it difficult for law enforcement to

understand, I believe **SPENCER** had some PCP ("up my sleeve"); he wished to meet with

**C. HILL** to sell it to him.

66.     At approximately 8:31 p.m., **C. HILL**, via **Target Telephone #1**, received a call

from **SPENCER**, using **Target Telephone #3**. During the ensuing conversation, after discussing

the previously missed call which went to voicemail, **C. HILL** informed **SPENCER** that he was

"at the house now." **SPENCER** responded by saying "Alright, here I come."

67.     At approximately 9:07 p.m., surveillance crews observed **SPENCER** leave 5443

Lydia Avenue operating **Target Vehicle #4**. Surveillance crews followed him to **Target

Residence #1.**

68.     With the assistance of a pole camera and a UAV, investigators observed **SPENCER**

arrive at **Target Residence #1** and presumably make contact with **C. HILL** at the residence, after

22

walking up the driveway. Though the lighting was poor, and video quality suffered, investigators observed **SPENCER** return to **Target Vehicle #4** clutching something to his chest. Then as **SPENCER** made his way to the driver's door, **SPENCER** was carrying a white item in his right hand. The item he was carrying was consistent with the size and shape of a bundle of United States currency, wrapped in something white, such as a grocery sack. **SPENCER** then left the residence in **Target Vehicle #4**. Agents believe **SPENCER** delivered PCP to **C. HILL** and was carrying the money **C. HILL** gave **SPENCER** for it.

69.     On June 23, 2023, investigators determined, based on GPS location data from **SPENCER's** phone, that he drove to Houston, Texas. Again, by monitoring GPS location data, investigators determined **SPENCER** returned to the Kansas City, Missouri area on June 24, 2023.

70.     On June 25, 2023, at approximately 11:26 a.m., **C. HILL**, via **Target Telephone #1**, received a phone call from **SPENCER**, on **Target Telephone #3**. During the ensuing conversation, **C. HILL** informed **SPENCER** that he (**C. HILL**) would be home after he left the "city market." After learning this, **SPENCER** informed **C. HILL** "I'll meet you out there."

71.     At approximately 1:35 p.m., **C. HILL**, via **Target Telephone #2**, received a call from **SPENCER**, on **Target Telephone #3**. During the ensuing conversation, **C. HILL** informed **SPENCER** that he was "headed home now" and that he would "See ya in a minute."

72.     In anticipation of the meeting between **C. HILL** and **SPENCER** at **Target Residence #1**, investigators responded to the area to initiate surveillance at approximately 1:56 p.m.

73.     At approximately 1:57 p.m., investigators observed **Target Vehicle #2** pull into the driveway of **Target Residence #1**. It was determined that **C. HILL** and **GINES** both arrived in the vehicle. They subsequently entered the residence.

74.     At approximately 2:38 p.m., **C. HILL**, via **Target Telephone #1**, called **SPENCER,** on **Target Telephone #3**. During the ensuing conversation, **SPENCER** informed **C. HILL** "I'm on, on my way, Chuck."

75.     At approximately 3:11 p.m., **C. HILL**, via **Target Telephone #1**, received a phone call from **SPENCER**, on **Target Telephone #3**. During the ensuing conversation, **SPENCER** once again informed **C. HILL** "I'm on my way."

76.     At approximately 3:13 p.m., investigators observed **C. HILL** and **GINES** exit the front door of **Target Residence #1**, get into **Target Vehicle #2**, and leave the location with **C. HILL** driving. Surveillance crews followed **Target Vehicle #2** from the location until it parked at a gas pump at the Inner City Oil, located at 3816 E. 31st Street, Kansas City, Missouri. **GINES** exited the front passenger seat and made a purchase from the convenience store while at least one unknown male subject got into the rear driver's side seat of **Target Vehicle #2**. After a few minutes, the unknown male got back out of **Target Vehicle #2** and **GINES** got back in. Based on my training, experience, and knowledge of this investigation, I believe the aforementioned encounter was consistent with a drug transaction.

77.     At approximately 3:34 p.m., via pole camera footage, investigators observed **Target Vehicle #4** pull into the driveway of **Target Residence #1**.

24

78.     At approximately 3:34 p.m., **C. HILL**, via **Target Telephone #1**, received a phone call from **SPENCER**, utilizing **Target Telephone #3**. During the ensuing conversation, **C. HILL** informed **SPENCER** "I just went down the street real quick. I'm about to pull back up."

79.     After hearing this conversation, surveillance crews ceased surveillance of **C. HILL** and **GINES** and returned to **Target Residence #1** in an order to beat them back to the residence and to set up surveillance of the location.

80.     At approximately 3:54 p.m., surveillance crews arrived back in the area of **Target Residence #1** and observed **Target Vehicle #4** still parked on the street, just south of the driveway.

81.     At approximately 3:56 p.m., investigators observed **C. HILL** and **GINES** pull into the driveway of their residence, **Target Residence #1**, occupying **Target Vehicle #2**.

82.     At approximately 4:00 p.m., **SPENCER** exited the driver's seat of **Target Vehicle #4** and walked around **Target Vehicle #4** and up the driveway toward the driver's door of **Target Vehicle #2**. **C. HILL** exited the driver's seat of **Target Vehicle #2** and engaged in conversation with **SPENCER**. The two of them walked down to **Target Vehicle #4** and continued to converse while standing on the passenger side of **Target Vehicle #4**. **SPENCER** and **C. HILL** were both looking around, and pointed at a surveillance vehicle, as they continued to talk.

83.     At approximately 4:05 p.m., **SPENCER** leaned into the open front passenger door of **Target Vehicle #4** and retrieved a white grocery sack. **C. HILL** walked up behind **SPENCER** and **SPENCER** passed the grocery sack backwards to **C. HILL** as he continued to look around. **C. HILL** took the grocery sack from **SPENCER** and quickly walked to the driver's door of **Target Vehicle #2**. He placed the grocery sack into **Target Vehicle #2** and then walked back down to **Target Vehicle #4** empty handed.

25

84.     **SPENCER** and **C. HILL** continued to converse for a few minutes and then at approximately 4:11 p.m., **SPENCER** got back into the driver's seat of **Target Vehicle #4** and left the location.

85.     Based on my training, experience, and knowledge of this case, I believe from these two interactions, coupled with **SPENCER's** trip to Houston, Texas, that **C. HILL** provided United States currency to **SPENCER** on June 20, 2023. **SPENCER** then drove to Houston, Texas, procured some PCP with **C. HILL's** funds, and then provided the PCP to **C. HILL** on June 25, 2023.

86.     On July 20, 2023, the Honorable Roseann Ketchmark, United States District Judge, Western District of Missouri, signed an order authorizing the initial interception of wire and electronic communications over **Target Telephone #3** for a period of 30 days (order number 23-WT-00004-RK).

87.     On July 27, 2023, at approximately 11:30 a.m., **SPENCER**, via **Target Telephone #3**, called **C. HILL**, utilizing **Target Telephone #2**. The entirety of the ensuing conversation is set forth below:

| | |
|---|---|
| **C. HILL**: | Ah, you made it back yet? Glad you made it back today and not yesterday, boy, them, them motherfucka's was trippin'... |
| **SPENCER**: | Yeah. What happened? |
| **C. HILL**: | Trippin', trippin'. Down there |
| **SPENCER**: | Who? |
| **C. HILL**: | Shit, who you think? You know [Unintelligible] Only people I be talkin' 'bout be trippin'. They the only people we worried about. |
| **SPENCER**: | [Unintelligible] |

| | |
|---|---|
| **C. HILL**: | [Chuckles] |
| **SPENCER**: | Ah, that, they land on your neck? |
| **C. HILL**: | [Unintelligible] They was just in the area like, like they was just, like they was out to get somebody. |
| **SPENCER**: | Over on uh…where? [Unintelligible] |
| **C. HILL**: | Where I be at! They was all over there, it was, they really was like over there, like, in uh, like on, uh, [Unintelligible] they turned down South Benton. Like on, like on 73rd. |
| **SPENCER**: | Uh-uh, uh-uh. |
| **C. HILL**: | Hold on real quick, hold on real quick, hold on. |
| **SPENCER**: | I ain't never been uh, okay. |
| **C. HILL**: | Matter of fact, I'mma, I'mma get with you when I get off work, you hear me? |
| **SPENCER**: | I ain't never, I ain't never knew you to be over that way, though. |
| **C. HILL**: | I know, I was just, you know all that's the same area though, you know it? Let me call you right back. |
| **SPENCER**: | Yeah, yeah. |
| **C. HILL**: | Matter of fact, I'mma hook up with you when I get off work. |
| **SPENCER**: | Okay. |
| **C. HILL**: | You know where to go! |
| **SPENCER**: | Alright, ah, you still…[Unintelligible] |
| **C. HILL**: | Hello? |

88.     Based on my training, experience, and knowledge of this case, I believe that **C. HILL** was talking about law enforcement when he mentioned the "Only people I be talkin' 'bout be trippin'. They the only people we worried about." I believe **SPENCER** and **C. HILL** intended to meet to discuss a PCP transaction in person since **SPENCER** had just returned to

27

town. Further, when **C. HILL** said to **SPENCER**, "You know where to go!" I believe **C. HILL** was referencing one of two locations, either **C. HILL's** residence, or the Gines Dry Cleaning Business.

89.     At approximately 3:41 p.m., **SPENCER**, via **Target Telephone #3**, called **C. HILL**, on **Target Telephone #2**. That call is set forth below:

> **C. HILL**:       Sup, fool?
>
> **SPENCER**:    Waddup. Yeah, you goin' down there or are you goin' to the house first?
>
> **C. HILL**:       Come on to the house real quick.
>
> **SPENCER**:    Alright, I'll meet you at the…here I come.

90.     After intercepting this conversation, I believe that **C. HILL** and **SPENCER** were coordinating a time and place to meet so they could conduct a PCP related transaction, or to discuss the details of an upcoming PCP related transaction in person, in an effort to lessen the chances of their conversation being intercepted.

91.     At approximately 3:42 p.m., via pole camera footage, investigators observed **C. HILL** arrive at **Target Residence #1**, operating **Target Vehicle #1**. **C. HILL** parked in the driveway and entered the front door of **Target Residence #1**.

92.     At approximately 3:55 p.m., via pole camera footage, investigators observed **SPENCER** arrive at **Target Residence #1**, operating **SPENCER's** rented silver Ford F-150. **SPENCER** pulled the F-150 into **C. HILL's** driveway and remained seated in the vehicle.

93.     At approximately 4:12 p.m., via pole camera footage, investigators observed **C. HILL** exit his residence and get into the front passenger seat of **SPENCER's** Ford F-150.

28

94.     At approximately 4:32 p.m., via pole camera footage and UAV video footage, investigators observed **C. HILL** exit **SPENCER's** Ford F-150 and make his way back into his residence as **SPENCER** left in the Ford F-150.

95.     On July 23, 2023, at approximately 11:10 a.m., **SPENCER**, via **Target Telephone #3**, received a phone call from **Charles WILEY**, using a phone number of (816) 406-6804. An excerpt of the ensuing conversation is set forth below:

| | |
|---|---|
| **SPENCER**: | Yo, yo, what up bro? |
| **WILEY**: | What's the deal? |
| **SPENCER**: | Uh…shit. |
| **WILEY**: | Sound like you still asleep. |
| **SPENCER**: | Nah, I'm up. |
| **WILEY**: | Shit, I'm tryin' to pull up on ya. |
| **SPENCER**: | Oh, okay. Where you at? |
| **WILEY**: | Right now I'm crossin' thir-, right here at the beach right now. |
| **SPENCER**: | Okay, okay. |
| **WILEY**: | But… |
| **SPENCER**: | Huh… |
| **WILEY**: | I can pull up on you, or somewhere closer to you. |
| [OMIT] | |
| **SPENCER**: | A'right. Give me a second. I'm about to call you…give me about fifteen, twenty minutes. I'm about to call you. |
| **WILEY**: | A'right. |

96.     Based on my training, experience, and knowledge of this case, I believe that **WILEY** and **SPENCER** intended to meet for the purpose of conducting a PCP transaction. Investigators

29

had prior knowledge that the term "the beach" was commonly used for a city park, specifically the Spring Valley Park and Plaza, located near 28th Street and Spring Valley Park Road, in Kansas City, Missouri, but it was unknown whether this was in fact what **WILEY** and **SPENCER** were referring to.

97.    At approximately 11:30 a.m., in an effort to witness the transaction between **WILEY** and **SPENCER**, surveillance crews responded to the area of the Spring Valley Park and Plaza.

98.    At approximately 11:49 a.m., via pole camera footage, investigators observed **SPENCER** leave **Target Residence #2** in the rented silver Ford F-150 pick-up truck, bearing Texas license SRF7465.

99.    At approximately 11:52 a.m., **SPENCER**, via **Target Telephone #3**, called **WILEY**, at (816) 406-6804. An excerpt of that call is set forth below:

> **WILEY**:        Yeah?
>
> **SPENCER**:    Bringin' that package to the beach.
>
> **WILEY**:        'Bout to be pullin' up down here this minute.
>
> **SPENCER**:    [VOICES OVERLAP] Oh, okay, okay. I'll be there in a sec.
>
> **WILEY**:        A'right.

100.    Surveillance crews remained in place for approximately an hour, but **SPENCER** was never observed and it became apparent **SPENCER** and **WILEY** met at another location.

101.    On August 3, 2023, at approximately 11:01 a.m., **SPENCER**, via **Target Telephone #3**, called **WILEY**, at (816) 406-6804. An excerpt of that call is set forth below:

> **WILEY**:        Yeah.

30

SPENCER:     Pull up, boy.

WILEY:       Shit, getting' ready to leave the house and start my day.

SPENCER:     Ah okay, ah, okay, okay.

WILEY:       Yeah.

SPENCER:     A'right, [Unintelligible]

WILEY:       A'right.

SPENCER:     A'right, just call me when you get out.

WILEY:       Okay.

102.   Based on my training, experience, and knowledge of this case, I believe this call indicates that **SPENCER** and **WILEY** intended to meet so that **WILEY** could pay **SPENCER** for the PCP **SPENCER** provided to **WILEY** on August 2, 2023.

103.   With this information, at approximately 11:30 a.m., surveillance crews responded to the area surrounding **Target Residence #2** with the intention of following **SPENCER** until he met with **WILEY** for the money transaction.

104.   At approximately 11:56 a.m., **SPENCER**, via **Target Telephone #3**, received a call from **WILEY**, on (816) 406-6804. That call is set forth below:

SPENCER:     Waddup, Brodie.

WILEY:       Where you at now?

SPENCER:     Ah, shit, about…probably about to head down there first.

WILEY:       Already.

SPENCER:     Huh?

WILEY:       Down here on Vine already.

SPENCER:     Oh, okay, okay. I'll see you there in a sec.

31

| | | |
|---|---|---|
| **WILEY**: | Right at the Beach, though. |
| **SPENCER**: | Okay, okay, okay, okay. I'll swing by there. |
| **WILEY**: | A'right. |

105.    After intercepting this conversation, investigators believed **SPENCER** and **WILEY** would meet at the same unidentified location, referred to as "the beach," where they presumably met on July 23, 2023.

106.    At approximately 12:17 p.m., via pole camera footage, investigators observed **SPENCER** leave **Target Residence #2**, operating **Target Vehicle #4**. Surveillance crews followed **SPENCER** from the location.

107.    At approximately 12:17 p.m., **SPENCER**, via **Target Telephone #3**, received a call from **WILEY**, on (816) 406-6804. That call is set forth below:

| | |
|---|---|
| **SPENCER**: | 'Bout 5, 6 minutes away. You hear me, bro? Hello? |
| **WILEY**: | Hello? |
| **SPENCER**: | Hello? Said, I'm about 5, 6 minutes away. |
| **WILEY**: | And I'm about to go down there. That motherfucker up here…too many Policemans stroll through this motherfucker already. |
| **SPENCER**: | Ah, oh, okay. Say no more. |
| **WILEY**: | Yeah, yeah, yeah, yep. |
| **SPENCER**: | A'right, a'right, a'right. See you in a second. |
| **WILEY**: | Yep. |

108.    After intercepting this communication, investigators believed **SPENCER** and **WILEY** were discussing each other's locations and their arrival times in order to coordinate a PCP related transaction.

32

109.    At approximately 12:25 p.m., **SPENCER** pulled over and parked **Target Vehicle #4** on the west side of Vine Street, between 18th Street and 19th Street, in Kansas City, Missouri, directly in front of a black 2022 Nissan Titan, bearing Kansas license R014940. The driver of the Nissan, later identified as **WILEY**, exited the driver's seat of the Nissan and got into the front passenger seat of **Target Vehicle #4.**

110.    At approximately 12:28 p.m., **WILEY** got back out of **Target Vehicle #4** and returned to the Nissan as **SPENCER** left in **Target Vehicle #4**, northbound on Vine Street. Investigators believed that **WILEY** paid **SPENCER** an unknown quantity of U.S. currency for PCP while seated in **SPENCER's** vehicle.

111.    At approximately 1:03 p.m., **WILEY** left the location operating the black Nissan and surveillance crews began to follow him in a covert manner. Surveillance crews followed **WILEY** from the location and observed him conduct what appeared to be several hand-to-hand transactions with unknown customers before surveillance was concluded.

112.    On August 18, 2023, the Honorable Roseann Ketchmark, United States District Judge, Western District of Missouri, signed an order authorizing the renewed wire interceptions over **Target Telephone #3** for a period of 30 days (order number 23-WT-00006-RK).

113.    On August 22, 2023, at approximately 10:43 a.m., SPENCER, via **Target Telephone #3**, called **Cheavez HOLMES**, using a phone number of 816-832-1837. An excerpt of the ensuing conversation is set forth below:

> **HOLMES:** You uh, you gonna make it back around?
>
> **SPENCER:** Huh?
>
> **HOLMES:** I said, "you gonna make it back around?"

**SPENCER:** Yeah, I'm around.

**HOLMES:** Man, shit, push up on me when you get a chance. For sure.

**SPENCER:** Okay, okay. A'ight.

114.    After intercepting this conversation, investigators believed that **HOLMES** wished for **SPENCER** to "push up on me," or respond to **HOLMES'** location, for the purpose of conducting a PCP related transaction.

115.    At approximately 10:43 a.m., via pole camera footage, investigators observed **Target Vehicle #4**, presumably occupied by **SPENCER**, leave **Target Residence #2.**

116.    At approximately 11:05 a.m., surveillance crews began to arrive in the area of 3421 Euclid Avenue, a residence previously associated to **HOLMES**. Upon their arrival, investigators observed a black GMC Yukon, bearing Missouri license VF8V2F, parked and unoccupied in front of the residence.

117.    Court authorized GPS location data from **Target Telephone #3** was monitored in an effort to confirm **SPENCER** left his residence in **Target Vehicle #4** and to determine **SPENCER's** current location. At approximately 11:08 a.m., **Target Telephone #3**, presumably in **SPENCER's** possession, was determined to be in the general area surrounding 44th Street and Woodland Avenue, Kansas City, Missouri, though it was also possibly on U.S. 71 Highway.

118.    At approximately 11:23 a.m., GPS location data from **Target Telephone #3** placed the device in the general area of 67th Street and South Benton Avenue, Kansas City, Missouri. Investigators have previously determined that a ping in that general area commonly indicated that

SPENCER was at or near his "Finishing Touchez" shop, located at 2611 E. 68th Street, Kansas City, Missouri **(Target Structure #3).**[7]

119.   With this information, surveillance crews responded to the shop and at approximately 11:38 a.m., **SPENCER** was observed leaving **Target Structure #3**, operating **Target Vehicle #4**. Surveillance crews followed him from the location and he proceeded northbound on Prospect Avenue.

120.   At approximately 11:49 a.m., **SPENCER** parked **Target Vehicle #4** in the area of 3301 or 3305 Olive Street, Kansas City, Missouri. **SPENCER** made contact with an unknown male subject at the location who was seen operating both a white two door Mercedes Benz, bearing Missouri license GD7X3L, and a white Lexus bearing Missouri dealer license D8746AB.

121.   At approximately 12:00 p.m., **SPENCER** left the location in **Target Vehicle #4** and surveillance crews followed him until he came to a stop in front of 3421 Euclid Avenue at approximately 12:01 p.m. After stopping for just a few moments, **SPENCER** proceeded northbound from the location.

122.   At approximately 12:01 p.m., **SPENCER**, via **Target Telephone #3**, called **HOLMES**, using a phone number of 816-832-1837. An excerpt of the ensuing conversation is set forth below:

> **HOLMES:**   What's up wit' it bro bro?

---

[7] A query of the Missouri Secretary of State website revealed that Russell SPENCER was the registered agent of a business identified as Finishing Touchez LLC. SPENCER also commonly operates a white Chevrolet Express panel van, which is regularly parked at the location, that is registered to Finishing Touchez, LLC. A google search of Finishing Touchez revealed an associated address of 2611 E. 68th Street, Kansas City, Missouri with a phone number of 816-258-4374. The business is listed as a "Car detailing service in Kansas City, Missouri" but to date, investigators have never seen any customers having their vehicle detailed at the location, though SPENCER has once been seen detailing his personal car.

| | |
|---|---|
| **SPENCER:** | What's up, boy, you rolled out, didn't ya? |
| **HOLMES:** | Uh, yeah, I'm pickin' uh, picked this uh [Unintelligible] from school right quick [Unintelligible] meet you back there. |
| **SPENCER:** | Okay, okay, okay, okay, I'll roll, okay. Man, somebody hit your truck again? |
| **HOLMES:** | Uh, uh, nah, that's uh, that's how it came that way. They hit the, the driver's uh, back door uh… |
| **SPENCER:** | Damn! |
| [OMIT] | |
| **HOLMES:** | Yeah, yeah. That's my [Unintelligible]. Yeah, I'm about to head back there now. |
| **SPENCER:** | Okay, okay, okay. How long…how far are you, prob'ly about twenty (20) minutes? |
| **HOLMES:** | Uh, uh, I'd say like 15. |
| **SPENCER:** | Okay, okay, okay. A'right. |
| **HOLMES:** | Yep. |

123.   After intercepting this conversation, investigators suspected **SPENCER** would be back to meet **HOLMES** within a relatively short period of time so surveillance crews remained near the residence and did not follow **SPENCER** from the location.

124.   At approximately 12:11 p.m., a red Chevrolet Camaro SS, bearing Missouri license TJ3K8B, pulled into the driveway of 3421 Euclid Avenue. Surveillance crews obtained photographs of the driver, who was later identified as **HOLMES**. **HOLMES** got out of the Camaro and went into the residence.

125.   At approximately 12:20 p.m., surveillance crews observed **SPENCER** park **Target Vehicle #4** on the street, in front of the black GMC, in front of 3421 Euclid Avenue.

36

126.    At approximately 12:21 p.m., **SPENCER**, via **Target Telephone #3**, called **HOLMES**, using a phone number of 816-832-1837. During the ensuing conversation, **SPENCER** informed **HOLMES** "I'm outside, yup."

127.    At approximately 12:22 p.m., surveillance crews observed **HOLMES** walk out of the residence and get into the front passenger seat of **Target Vehicle #4.**

128.    At approximately 12:24 p.m., surveillance crews observed **HOLMES** get back out of **Target Vehicle #4** and walk back to the residence. As he walked, **HOLMES** was carrying a large white package beneath his right arm, which investigators suspect contained PCP. **SPENCER** left northbound on Euclid Avenue and was not followed from the location.

129.    On August 30, 2023, at approximately 3:42 p.m., via pole camera footage, investigators observed **GINES** arrive home at **Target Residence #1**, operating **Target Vehicle #1**.

130.    At approximately 3:43 p.m., via pole camera footage, investigators observed **C. HILL** also arrive home at **Target Residence #1**, operating his silver Ford Escape, **Target Vehicle #3**.

131.    At approximately 3:44 p.m., via pole camera footage, investigators observed **GINES** and **C. HILL** enter **Target Residence #1** through the front door.

132.    At approximately 3:46 p.m., **SPENCER**, via **Target Telephone #3**, placed an outgoing phone call to **C. HILL**, using **Target Telephone #1**. An excerpt of the ensuing conversation is set forth below:

        **C. HILL:**     Hello?

        **SPENCER:**   Waddup, Wag? What give? [Audio glitch]

37

| | |
|---|---|
| **C. HILL:** | What'd you say? |
| **SPENCER:** | Where you at? You at home takin' a shower? |
| **C. HILL:** | Nah, I can't take no shower right now, I gotta, I gotta get on the mission. |
| **SPENCER:** | Oh yeah. |
| **C. HILL:** | [Voices Overlap] What's up wit' it? |
| **SPENCER:** | [Chuckling] I'm tryin' to see you. I'm tryin' to see you outside [Chuckles][Unintelligible] needs it. [Chuckles]. |
| **C. HILL:** | Um, [Unintelligible] it's all bad right now, I'm…that's why I'm 'bout to get on it right now. I gotchu. |
| **SPENCER:** | Nah, nah, I'm, I'm, I'm, uh, nah! |
| **C. HILL:** | What's up? Oh, you want me to talk to you? |
| **SPENCER:** | Yeah. |
| **C. HILL:** | I'll be down there. I'll be down there. |
| **SPENCER:** | Yeah, nah, it, I mean, it would probably be better for me to come there. [Unintelligible]. [Chuckles] |
| **C. HILL:** | What's up, talk to me? |
| **SPENCER:** | Nah, I got somebody that called me. Shit, [Chuckles] that's, so… |
| **C. HILL:** | Huh? |
| **SPENCER:** | Nah, I said I'm getting', uh, I could kill that, but you know they called  me. |
| **C. HILL:** | Ah, you wanted me to bring you, uh, a chicken dinner down there? |
| **SPENCER:** | Yeah! |
| **C. HILL:** | A'right. |
| **SPENCER:** | Nah, not, not, you know, not…just, yeah, yeah just… you know, the one (1). |

38

**C. HILL:**      I know.

**SPENCER:**      Okay.

[OMIT]

**C. HILL:**      Boy, I'm in your pocket now, G. You hear me?

**SPENCER:**      [Voices Overlap] Not lately, you scared a been, we could'a been less.

**C. HILL:**      Man, you better, you better pull your calculator out!

**SPENCER:**      Shit, you wadn't, you wadn't even yet, you wadn't even Steven.

**C. HILL:**      [Chuckles] Yeah! Eh, pull your calculator out.

**SPENCER:**      Nah, I…

**C. HILL:**      I'm comin' down there.

**SPENCER:**      Nah, you wadn't even.

**C. HILL:**      You must of forgot all that other.

**SPENCER:**      Nah.

**C. HILL:**      Ah, you know it, I-I'm 'onna, I'm gonna have to bring my calculator there, 'cause you know I gotchu…

**SPENCER:**      [Voices Overlap] Yeah, bring it down 'cause you wadn't even. You wadn't even, brother.

**C. HILL:**      [Voices Overlap] I gotchu, [Chuckles] I gotchu.

**SPENCER:**      You still the band-aid, you still the band-aid [Unintelligible][Chuckles]

**C. HILL:**      What happened with the…

**SPENCER:**      It still, it still was two (2), but I thought…

**C. HILL:**      What happened with the, with, with the four (4) and the, the eight (8)? What happened to that? You forgot that, n****!

**SPENCER:**      [Voices Overlap] Nah, ah, ah, I ain't took no eight (8) from you.

39

| | |
|---|---|
| **C. HILL:** | You, you, y'all talkin' about the… the other. I'll talk to you when you get down there. |
| **SPENCER:** | Bet. |
| **C. HILL:** | I gotchu. |

133.    It was evident that **SPENCER** wished to meet up with **C. HILL** in person and did not wish to speak over the phone. **C. HILL** informed **SPENCER** that he (**C. HILL**) would be "down there," or presumably, at the Gines Dry Cleaning and Alterations and Laundry business, herein referred to as "the cleaners," located at 3720 E. 31st Street, Kansas City, Missouri. After **C. HILL** mentioned that, **SPENCER** commented that it would "probably be better for me to come there," presumably referring to **C. HILL's** residence. This led investigators to believe that **SPENCER** needed something from **C. HILL** which **C. HILL** would have in his possession at his residence.

134.    **SPENCER** then informed **C. HILL** "I got somebody that called me." From this statement, investigators believe **SPENCER** was contacted by somebody who wished to purchase PCP from him. Investigators suspected that **SPENCER** had sold all the PCP he had in his own possession and he was trying to obtain some PCP from **C. HILL** to sell to the third party. **C. HILL** obviously understood what **SPENCER** meant by this statement because **C. HILL** asked **SPENCER** whether **SPENCER** "wanted me to bring you, uh, a chicken dinner down there?" Investigators assumed **C. HILL** was asking **SPENCER** if he (**C. HILL**) should bring a larger quantity of PCP than he regularly carried in his possession, to provide **SPENCER**. **SPENCER** initially responded by saying "Yeah!" but then clarified that he just needed "you know, the one."

135.    Later in the conversation, **C. HILL** commented that he (**C. HILL**) was now "in your (**SPENCER's**) pocket." Investigators understood this to mean that **C. HILL** was informing

40

**SPENCER** that his debt to **SPENCER** had been fully paid, and then some. **SPENCER** disputed that claim and said that **C. HILL** had not been "even Steven." **SPENCER** and **C. HILL** continued to argue and **C. HILL** commented that **SPENCER** must have forgotten "all that other," or presumably some additional U.S. Currency he had already provided **SPENCER**. **C. HILL** specifically asked **SPENCER** about the "four" and the "eight." Investigators believe **C. HILL** was referencing increments of a thousand, or presumably $4,000 and $8,000 respectively.

136.  **C. HILL** ended the conversation by saying he would talk to **SPENCER** "when you get down there" so investigators assumed they intended to meet in person at the cleaners to discuss the details further and to make the necessary transaction.

137.  At approximately 3:51 p.m., via pole camera footage, investigators observed **C. HILL** walk out the front door of **Target Residence #1** and approach the driver's door of **Target Vehicle #2**. HILL opened the driver's door of **Target Vehicle #2** but then returned inside of **Target Residence #1** at approximately 3:52 p.m.

138.  At approximately 3:53 p.m., via pole camera footage, investigators observed **C. HILL** once again walk out the front door of **Target Residence #1**. It was determined **C. HILL's** hands were empty as he approached **Target Vehicle #1**, which was parked in the driveway. **C. HILL** opened the driver's door of **Target Vehicle #1** and leaned into the interior. After several moments, **C. HILL** stood back up, closed the door, and made his way to **Target Vehicle #2**. As he walked, investigators observed he was carrying an object shaped like a bottle but possibly wrapped in a grocery sack, in his right hand. **C. HILL** got into the driver's seat of **Target Vehicle #2** and closed the door.

41

139.   At approximately 3:55 p.m., via pole camera footage, investigators observed **GINES** walk out the front door of **Target Residence #1**. She walked to **Target Vehicle #2** and got into the front passenger seat. **C. HILL** and **GINES** then left the location in **Target Vehicle #2**.

140.   At approximately 6:34 p.m., **SPENCER**, via **Target Telephone #3**, placed an outgoing phone call to **C. HILL**, using **Target Telephone #1**. An excerpt of the ensuing conversation is set forth below:

| | |
|---|---|
| **C. HILL:** | Russ Russ, where you at? |
| **SPENCER:** | Yeah, I'm on Van Brunt, boy. [Chuckles] Where you at, boy? |
| **C. HILL:** | Ah, you over there. I'm right here on 39th Street. |
| [OMIT] | |
| **C. HILL:** | I'm right here on Thirty-Ninth (39th) past the [Unintelligible] … Troost. |
| **SPENCER:** | Ah, I'm at [Unintelligible], man. Come on uh, on Forty-Third (43rd), uh Forty-Fourth (44th) and Wayne, man. |
| **C. HILL:** | You right there now? |
| **SPENCER:** | I'll be there in a minute [Unintelligible] far away. |
| **C. HILL:** | A'right. |

141.   At approximately 6:42 p.m., **SPENCER**, via **Target Telephone #3**, placed an outgoing phone call to **C. HILL**, using **Target Telephone #1**. An excerpt of the ensuing conversation is set forth below:

| | |
|---|---|
| **C. HILL:** | You said where? You say Forty-Fourth (44th)? Yeah. |
| **SPENCER:** | Forty-Fourth (44th) and Wayne. |
| **C. HILL:** | I'll be there. |

42

142.    Presumably, **SPENCER** and C. **HILL** had not managed to meet up but from the content of this conversation, investigators assumed they met shortly after this call, in the area of 44th Street and Wayne Avenue, in Kansas City, Missouri.

143.    On August 31, 2023, at approximately 10:58 a.m., and again at approximately 10:59 a.m., **SPENCER**, via **Target Telephone #3**, received a telephone call from 816-406-6804, a phone number previously associated to **WILEY**. Neither of these calls were answered by **SPENCER**.

144.    At approximately 11:39 a.m., **SPENCER**, via **Target Telephone #3**, received a telephone call from 816-915-7345, another phone number associated to **WILEY**. This call also went unanswered.

145.    Believing that **WILEY** was attempting to get ahold of **SPENCER** for the purpose of conducting a PCP related transaction, at approximately 1:10 p.m., surveillance crews responded to the area of 18th Street and Vine Street, Kansas City, Missouri, in an effort to locate **WILEY**.

146.    At approximately 1:15 p.m., surveillance crews located **WILEY** standing near the Zodiac Motorcycle Club, located at 1825 Vine Street, Kansas City, Missouri.

147.    Investigators also located **WILEY's** silver and black AMG series Mercedes, bearing Missouri license BG4X2P, parked on Vine Street, just north of his location.

148.    At approximately 1:22 p.m., **WILEY** walked to his Mercedes and left northbound on Vine Street. **WILEY** turned east on 18th Street, south on Highland Avenue, west on 19th Street, and then back north on Vine Street. **WILEY** parked the Mercedes just north of the intersection, on the west side of Vine Street.

43

149.    After parking the Mercedes, **WILEY** exited the vehicle and walked north on Vine Street. At approximately 1:34 p.m., **WILEY** approached a silver Ford Fusion bearing an expired Missouri temporary permit of 06HL8G. **WILEY** stood next to the vehicle for a few moments, conversing with the occupants.

150.    At approximately 1:37 p.m., **WILEY** got into the Fusion, from the driver's side, at which time surveillance crews lost sight of him.

151.    At approximately 1:50 p.m., the Fusion pulled away northbound on Vine Street.

152.    Moments later, **WILEY's** Mercedes also pulled away northbound on Vine Street. Surveillance crews never observed **WILEY** exit the Fusion and return to his Mercedes though it was confirmed **WILEY** was driving it. Presumably, **WILEY** exited the Fusion from the passenger side, which was hidden from view by construction equipment at the location.

153.    Surveillance crews followed the Fusion from the location as it proceeded west on 18th Street and then southbound on The Paseo Boulevard. The Fusion got onto U.S. 71 Highway southbound and then exited onto Emanuel Cleaver II Boulevard. The Fusion turned West on Emanuel Cleaver II Boulevard and then south on Virginia Avenue.

154.    At approximately 1:59 p.m., Kansas City Missouri Police Department (KCMOPD) police officers conducted a traffic stop on the Fusion, based upon the expired registration, near 4704 Virginia Avenue, Kansas City, Missouri.

155.    Contact was made with the occupants of the vehicle and Brandon L. HUNTER was identified as the driver. A female passenger, who refused to provide her identity, was also contacted. The Officers determined HUNTER had no wants or warrants and had a valid Missouri driver's license, so he was released from the scene with a warning.

44

156.    Surveillance crews returned to the area of 18th Street and Vine Avenue in an effort to reacquire **WILEY** but he was not located.

157.    Surveillance efforts were ceased at approximately 3:00 p.m.

158.    At approximately 5:28 p.m., **SPENCER**, via **Target Telephone #3**, attempted to make a phone call to **C. HILL**, using **Target Telephone #1**. Upon doing so, **SPENCER** received an automatic message which informed him he needed to "stay on the line to enable your service." **SPENCER** provided the necessary information through the automated service and extended his phone service plan until September 30, 2023.

159.    At approximately 5:33 p.m., **SPENCER**, via **Target Telephone #3**, made an outgoing call to **WILEY** at 816-406-6804. During the ensuing conversation, **SPENCER** informed **WILEY** that he just paid the bill and agreed to call **WILEY** once he (**SPENCER**) left Independence (Missouri).

160.    During that timeframe, court authorized GPS pings for **Target Telephone #3**, presumably in **SPENCER's** possession, placed the device near 44th Street and Noland Road, Independence, Missouri.

161.    At approximately 7:20 p.m., **SPENCER**, via **Target Telephone #3**, made an outgoing call to **C. HILL**, using **Target Telephone #1**. An excerpt of the ensuing conversation is set forth below:

> **SPENCER:**    I'm waiting for you Wag.
>
> **C. HILL:**    Shit!
>
> **SPENCER:**    Trying to help you out.
>
> **C. HILL:**    [Unintelligible] Where you at?

45

**SPENCER:**    Coming through the city now from Independence.

**C. HILL:**    Where I need to be at? What you tryin' to uh, do I need to go out there and get the same thing from yesterday?

**SPENCER:**    Nah, nah uh... I don't know at the moment but he prob'ly, he prob'ly all ready... you know what I mean?

**C. HILL:**    Yeah. Just let me know.

**SPENCER:**    [Unintelligible] A'right. Where you gonna, uh, give me about 20 minutes be down [Unintelligible] meet you by the cleaners?

**C. HILL:**    Yep.

**SPENCER:**    Alright. About 20 minutes.

162.   After intercepting this conversation, investigators suspected that **SPENCER** intended to meet with **C. HILL**, prior to meeting up with **WILEY**, so that **SPENCER** could procure some of the remaining PCP **C. HILL** had in his possession, to sell to **WILEY**. Previous intercepted phone calls and observations led investigators to believe **SPENCER** was currently out of PCP but was assisting **C. HILL** by selling some of PCP **C. HILL** had been unable to sell.

163.   At approximately 7:33 p.m., **SPENCER**, via **Target Telephone #3**, made an outgoing call to **C. HILL**, using **Target Telephone #1**. An excerpt of the ensuing conversation is set forth below:

**SPENCER:**    Waddup boy, where you at now?

**C. HILL:**    Where you at?

**SPENCER:**    I'm uh, over here by uh...35th.

**C. HILL:**    Come on I'm here.

**SPENCER:**    A'right, give me one sec, I'm dropping this fool off the rest.

**C. HILL:**    Yeah.

46

> **SPENCER:** A'right.

164.    After intercepting this conversation, investigators believed **C. HILL** and **SPENCER** were coordinating a spot to meet, presumably at the Gines Dry Cleaning and Alterations and Laundry business, located at 3720 E. 31st Street, Kansas City, Missouri. **SPENCER** informed **C. HILL** that he was "dropping this fool off the rest." Investigators believed that **SPENCER** was informing **C. HILL** that he (**SPENCER**) intended to drop the remainder of **C. HILL's** PCP off with "this fool," presumably **WILEY**.

165.    At approximately 7:35 p.m., **SPENCER**, via **Target Telephone #3**, made an outgoing call to **WILEY**, using phone number 816-406-6804. An excerpt of the ensuing conversation is set forth below:

> **SPENCER:** Where you at now?
>
> **WILEY:** Down here, I got your sister in a headlock. [Laughs] [Background: UF: Nah, that's a lie].
>
> [OMIT]
>
> **SPENCER:** I'll be down there in a minute, though.

166.    After intercepting this conversation, surveillance crews responded to the area of 18th Street and Vine Avenue in an effort to locate **WILEY** prior to SPENCER's arrival. At approximately 7:48 p.m., **WILEY's** silver and black AMG series Mercedes, bearing Missouri license BG4X2P, was located parked on the east side of Vine Street, between 18th Street and 19th Street. **WILEY** was observed seated in the driver's seat of the vehicle, wearing the same light blue shirt he had been wearing earlier that day.

167.    At approximately 7:55 p.m., **WILEY** left the location northbound on Vine Street and surveillance did not attempt to follow him.

47

168.   At approximately 8:01 p.m., **SPENCER**, via **Target Telephone #3**, received an incoming call from **WILEY**, using phone number 816-406-6804. An excerpt of the ensuing conversation is set forth below:

> **SPENCER:**   Yeah, I'll be there in about seven (7) minutes.
>
> **WILEY:**        Huh?
>
> **SPENCER:**   I said, I'll be there 'bout five (5) minutes.
>
> **WILEY:**        Alright.

169.   At approximately 8:04 p.m., **WILEY** returned in his Mercedes, and parked on the west side of Vine Street, between 18th Street and 19th Street.

170.   At approximately 8:12 p.m., **Target Vehicle #4** pulled up and parked directly in front of **WILEY's** Mercedes. **WILEY**, who had been standing next to his Mercedes, immediately approached **Target Vehicle #4** and got into the front passenger seat. After less than 30 seconds, **WILEY** got back out of **Target Vehicle #4** and made his way back to his Mercedes as **SPENCER** left northbound on Vine Street. Though the lighting was poor, as **WILEY** exited **Target Vehicle #4** and walked back toward his Mercedes, it appeared was carrying a phone in his left hand and an unknown object in his right hand which he placed in his right shorts pocket.

171.   After a few minutes, **WILEY** pulled away in the Mercedes and surveillance was terminated.

172.   On September 3, 2023, at approximately 5:11 p.m., **SPENCER**, via **Target Telephone #3**, called **C. HILL**, using **Target Telephone #1**. The entirety of the ensuing conversation is set forth below:

> **C. HILL:**      What's up, fool? Hello?

48

| | |
|---|---|
| **SPENCER:** | [Unintelligible] Waddup wit' you, bro? |
| **C. HILL:** | What's up wit' you? Talk to me. |
| **SPENCER:** | Yeah, where you at, boy? |
| **C. HILL:** | Shit, 'bout to be out to the cleaners. |
| **SPENCER:** | Ah, meet you out there in a bit. |
| **C. HILL:** | Yep. |
| **SPENCER:** | But you goin' out there to stay or you gonna get back out? |

173.   Based upon this intercepted conversation, investigators believed **SPENCER** was trying to determine where **C. HILL** would be so that he (**SPENCER**) could meet up with him. From previous intercepted communications and observations, investigators suspected that **SPENCER** did not have any PCP in his own possession to sell but that he intended to obtain the PCP from **C. HILL** which he would in turn sell to **WILEY**.

174.   At approximately 6:59 p.m., **SPENCER**, via **Target Telephone #3**, placed an outgoing phone call to **C. HILL**, using **Target Telephone #1**. The entirety of the ensuing conversation is set forth below:

| | |
|---|---|
| **SPENCER:** | Yeah, you out there? |
| **C. HILL:** | Mm-hmm |
| **SPENCER:** | Ah, I'm 'bout to get [Unintelligible], I'm on my way out there now. I'm comin' back that way. |
| **C. HILL:** | [Voices Overlap] Yeah, I'm here. |
| **SPENCER:** | Yep. |
| **HILL:** | A'right. C'mon. |

49

175. After intercepting this conversation, investigators suspected **SPENCER** was on his way to **C. HILL's** location in order to obtain some PCP from him. As a result, investigators began to actively monitor the pole camera located at **Target Residence #1**.

176. At approximately 7:39 p.m., via pole camera footage, investigators observed **SPENCER** park in front of **C. HILL's** residence, **Target Residence #1**, operating his rented burgundy 2022 Jeep Grand Cherokee, bearing Florida license 11BJNR.

177. At approximately 7:41 p.m., **SPENCER**, via **Target Telephone #3**, placed an outgoing phone call to **C. HILL**, using **Target Telephone #1**. The entirety of the ensuing conversation is set forth below:

| | |
|---|---|
| **C. HILL:** | What's up, bro? |
| **SPENCER:** | I'm outside. |
| **C. HILL:** | Come on up, n****. |
| **SPENCER:** | [Groans] |

178. At approximately 7:43 p.m., via pole camera footage, investigators **observed C. HILL** open his front door and step out onto the stoop.

179. Moments later, also at approximately 7:43 p.m., via pole camera footage, investigators observed **SPENCER** get out of the Jeep and make his way up to the front stairs of **C. HILL's** residence. **C. HILL** and **SPENCER** talked for several minutes directly in front of the house. While doing so, **GINES** came out of the house and handed what appeared to be a plate of food to **SPENCER.**

50

180.   At approximately 7:49 p.m., via pole camera footage, investigators **observed** **C. HI**LL walk back into **Target Residence #1** through the front door. **SPENCER** walked down the stairs and began to mill around the driveway, between the cars which were parked there.

181.   At approximately 7:50 p.m., via pole camera footage, investigators observed **SPENCER** open the rear hatch of **C. HILL's** black Chevrolet Tahoe, bearing Missouri license RA9L4E. He then closed the hatch and then opened the driver's door of the vehicle. After a moment, he closed that as well.

182.   At approximately 7:51 p.m., via pole camera footage, investigators observed **SPENCER** open the rear hatch of **C. HILL's** silver Ford Escape, **Target Vehicle #3**. **SPENCER** rummaged around in the back, then closed it again.

183.   At approximately 7:52 p.m., via pole camera footage, investigators observed **SPENCER** open the tailgate of **Target Vehicle #2** and rummage around in the bed for a moment. He then closed it as well.

184.   At approximately 7:57 p.m., via pole camera footage, investigators observed **SPENCER** walk back to his Jeep and place the plate of food in the back seat.

185.   At approximately 7:58 p.m., via pole camera footage, investigators observed **C. HILL** open his front door. **SPENCER** approached him and they conversed for a few moments, with an unknown male standing next to the door. **C. HILL** then went back inside **Target Residence #1.**

186.   Moments later, also at approximately 7:58 p.m., via pole camera footage, investigators observed **C. HILL** open the front door of **Target Residence #1**, and step out. He conducted a hand-to-hand transaction with **SPENCER** at approximately 7:59 p.m. and **SPENCER**

51

immediately walked back to his Jeep as **C. HILL** returned inside **Target Residence #1**. **SPENCER** left in his Jeep approximately 30 seconds later.

187.   On September 6, 2023, **SPENCER** left the Kansas City metropolitan area and proceeded to drive to Houston, Texas. Investigators suspected, from prior intercepted communications over **Target Telephone #3**, that the purpose of the trip to Houston was to procure a fresh batch of PCP from **SPENCER's** Source of Supply (SOS).

188.   On September 8, 2023, at approximately 9:20 a.m., by monitoring GPS ping locations for **SPENCER's** cellular telephone, **Target Telephone #3**, investigators determined **SPENCER** was northbound out of Houston, Texas. Investigators continued to monitor the GPS ping locations and determined **SPENCER** was headed back to the Kansas City metropolitan area.

189.   At approximately 1:48 p.m., **SPENCER**, via **Target Telephone #3**, received an incoming phone call from **C. HILL**, using **Target Telephone #2**. An excerpt of the ensuing conversation is set forth below:

| | |
|---|---|
| **C. HILL:** | Man, yeah, you know. What's up? Talk to me. |
| **SPENCER:** | Ah, shit. [Unintelligible] rubbing my hands.[Chuckles] |
| **C. HILL:** | Huh? |
| **SPENCER:** | I said, "rubbing my fingers" like… |
| **C HILL:** | Ah yeah? |
| **SPENCER:** | [Voices Overlap] Nah, that's right, uh, nah, that's right, "you rubbing your fingers." [Chuckles] |
| **C. HILL:** | Huh? You already know. I ain't, I ain't listenin'. |
| **SPENCER:** | [Voices Overlap] Ain't that bad, I'm glad it ain't that bad [Unintelligible] you too. |
| **C. HILL:** | Yeah, it's too bad. Whatchu talkin' about? |

52

SPENCER:    Nah, I ain't, I ain't that bad, brotha.

C. HILL:    It ain't nothin', a teenager.

SPENCER:    Yeah, that ain't, that uh, teenagers [Chuckles]

C. HILL:    [Voices Overlap] Yeah, it ain't too…it ain't too bad.

SPENCER:    Yeah. Those teenagers, you know what I'm sayin', I can take that.
            Take that lumpity bump.

C. HILL:    Ah yeah? I thought you had some…news I could use.

SPENCER:    Huh?

C. HILL:    I said, "I thought that you had some news I could use."

SPENCER:    Ah, I probably will.

C. HILL:    Alright. Just let me know when you're ready.

SPENCER:    Ah, yeah. You, you, you down. [Chuckles]

C. HILL:    Yes sir.

SPENCER:    [Unintelligible] you down. Did you uh…

C. HILL:    [Unintelligible] Hello?

SPENCER:    Did you get a chance to uh…

C. HILL:    Do what?

SPENCER:    I said, "put a, did you put a dent in that one stuff?"

C. HILL:    Mm-mm. Nope…it's still.

SPENCER:    No shit.

C. HILL:    Mmm-mm.

SPENCER:    Damn.

C. HILL:    I need your help.

SPENCER:    Alright, I'll see you [Unintelligible]

**C. HILL:** Alright.

190.　During this conversation, **SPENCER** and **C. HILL** discussed a "teenager." A teenager, or a "teener," is a common slang term used to describe 1/16th of an ounce but in this instance, investigators believe the term is being used to describe 1/16th of a gallon, or 8 fluid ounces. In previously intercepted conversations, the term "sixteen" was also used. Investigators believe that **C. HILL** was still in possession of a container of PCP, possibly a "teenager," or an 8 fluid ounce container, which he had been unable to "put a dent in." **SPENCER** commented that it would not be "too bad" if he had to "take that lumpity bump," or to absorb the cost of the remaining container of PCP which **C. HILL** had been unable to sell. Also, during this conversation, **C. HILL** asked **SPENCER** if he (**SPENCER**) had any "news I can use." Investigators believe **C. HILL** was asking whether **SPENCER** had been able to procure a fresh batch of PCP and **SPENCER** advised **C. HILL** "I probably will."

191.　At approximately 7:00 p.m., surveillance crews began to stage at different locations along I-35, in Kansas, in an effort to locate **SPENCER** and to initiate surveillance of him as he returned to the city.

192.　Investigators continued to monitor GPS ping locations to assist with locating **SPENCER** and at approximately 8:30 p.m., investigators located **SPENCER's** most current rental car, a burgundy colored 2022 Jeep Grand Cherokee, bearing Florida license 11BJNR, northbound on I-35 near Mile Marker 198.

193.　Surveillance crews followed the Jeep back into Kansas City, Missouri and at approximately 9:05 p.m., the Jeep arrived at **SPENCER's** "Finishing Touchez" shop, located at **Target Structure #3**.

54

194.    By way of monitoring pole camera footage, investigators observed the Jeep back up so that the rear hatch was near the gated entrance. **SPENCER** was then observed exiting the driver's seat of the Jeep and walking around to the back of the Jeep. **SPENCER** opened the rear hatch of the vehicle and leaned in momentarily. He then stood back up and turned around to his gate. While doing so, an unknown passenger joined him near the back of the Jeep. They opened the gate and then **SPENCER** returned to the driver's seat and backed the Jeep through the gated entrance and stopped partially behind the building, so that the rear hatch was hidden from view.

195.    At approximately 9:06 p.m., via pole camera footage, investigators observed **SPENCER** and the unknown male subject moving in and out of sight behind the building, near the rear hatch of the Jeep, as if unloading something from the load space of the vehicle.

196.    At approximately 9:11 p.m., via pole camera footage, investigators observed **SPENCER** get back into the driver's seat of the Jeep and pull the Jeep back through the gate and onto the city street. **SPENCER** and the unknown male closed and locked the gate, and then got back into the Jeep. They left in the Jeep at approximately 9:13 p.m.

197.    Surveillance crews followed the Jeep as it left the location until it came to a stop in front of either 4919 E. 40th Place, or 4923 E. 40th Place, Kansas City, Missouri at approximately 9:27 p.m. **SPENCER** and the unknown male passenger exited the vehicle and popped the rear hatch once more. The unknown male passenger obtained a bag from the load space of the vehicle and then walked out of sight toward the residences, though it was unclear which residence he entered. **SPENCER** sat for a moment in the Jeep, and then left eastbound.

198.    Surveillance crews continued to follow the Jeep until **SPENCER** arrived home, at **Target Residence #2**, at approximately 9:30 p.m.

55

199.   By monitoring pole camera footage, investigators observed the Jeep pull into the drive-way and come to a stop. **SPENCER** exited the vehicle, walked out of sight down the drive-way, presumably to open his gate, and then returned to the Jeep. **SPENCER** then pulled the Jeep out of sight toward the rear of the residence.

200.   At approximately 9:33 p.m., via pole camera footage, investigators observed **SPENCER** walk back into view from the back yard and into **Target Residence #2**.

### *Cellular Telephones*

201.   Individuals involved in criminal activity utilize mobile telephones to facilitate crimes. Specifically, I am aware that individuals involved in criminal activity utilize mobile telephones, whether through telephone conversations or text messages, as a medium to communicate with coconspirators during the planning and commission of crimes, particularly the distribution of controlled substances. For instance, as detailed herein, numerous DTO members have been intercepted pursuant to a court order communicating with **C. HILL** or **SPENCER.**

202.   I believe that some of the mobile telephones used by DTO members remain active or, even if inactive, may still be found at their residences. I know, based on my training and experience, that drug traffickers commonly maintain their mobile telephones at their residences or on their persons.

203.   Based on my training and experience, I know that mobile telephones may be important to a criminal investigation because mobile telephones may be evidence or instrumentalities of crime, and/or may be used as storage devices that contain evidence of crime in the form of electronic data. Specifically, mobile telephones frequently contain electronic data that constitutes evidence of criminal activity. The following are examples of how mobile

56

telephones are commonly used to facilitate drug trafficking activity and how electronic data stored within the mobile telephones commonly constitute evidence of criminal activity:

        a.      A mobile telephone can act as a wireless telephone, which is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books"; and storing dates, appointments, and other information on personal calendars. Electronic address books frequently reveal the identities of criminal associates and the telephone numbers that the criminal associates maintain.

        b.      A mobile telephone can act as a personal digital assistant ("PDA"), which is a handheld electronic device used for storing data (such as names, addresses, appointments or notes). PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Names and addresses stored within PDAs frequently pertain to criminal associates or locations where drug traffickers conduct their criminal activity. Appointments and other notes also frequently pertain to drug trafficking activity conducted by the user of the telephones.

        c.      A mobile telephone can act as a digital camera, which is a camera that records pictures as digital picture files, rather than by using photographic film. Digital

57

cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Most digital cameras also include a screen for viewing the stored images. Drug traffickers often take still photographs and videos of themselves and their associates while engaged in criminal activity or with the proceeds of criminal activity and maintain these photographs and videos on their mobile telephones.

d.      A mobile telephone can send SMS messages (or "text messages") and e-mails. SMS messages are communications sent between mobile telephone users. SMS messages and e-mails may be stored on a mobile telephone. These communications frequently pertain to criminal activity.

e.      A mobile telephone can also contain applications, which allow communication between users of mobile telephones other than by a conventional telephone call, text message, or e-mail. Drug traffickers often communicate with applications that use end-to-end encryption to avoid interception of the communications by law enforcement. Examples of applications with end-to-end encryption that drug traffickers commonly use to communicate include WhatsApp, FaceTime, TextNow, and Facebook Messenger.

204.   In this case, the warrant application requests permission to search and seize any and all mobile telephones found at the **Target Structures** and in the **Target Vehicles**, as the DTO members are known to utilize mobile telephones in furtherance of drug trafficking activity based on numerous intercepted communications. Even if not longer actively utilized, mobile

58

telephones found at the **Target Structures** or in the **Target Vehicles** may contain records relating to intercepted communications, and may serve as evidence of who engaged in the communications using the device. I am also aware that drug traffickers commonly use multiple mobile phones and often change phones in an attempt to thwart law enforcement efforts, such as phone location tracking and wire intercepts.

### *Summary*

205. Based on the foregoing, I believe that the **Target Structures** and **Target Vehicles** will contain evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846, that is, distribution of controlled substances, possession with the intent to distribute controlled substances, and conspiracy to distribute controlled substances; 21 U.S.C. § 843(b), that is, use of a communication facility to facilitate a drug trafficking crime; 18 U.S.C. § 922(g)(1), that is, felon in possession of a firearm; 18 U.S.C. § 924(c), that is, possession of a firearm in furtherance of a drug trafficking crime or crime of violence; 18 U.S.C. § 1956(h), that is, conspiracy to commit money laundering; and 18 U.S.C. §§ 2 and 371, that is, aiding and abetting and conspiracy to commit the foregoing offenses. Based on the foregoing, I have probable cause to believe and do believe there is probable cause to request that the Court issue search warrants directing the search of the locations further described in **Attachments A1-A7** for the items described in **Attachments B1–B4**, which are contraband or evidence, or are otherwise used to facilitate or promote, or which constitute proceeds of the crimes listed above.

## CONCLUSION

206. Based on my training and experience, and through the intelligence gathered in the course of this investigation, I expect to find the evidence, fruits, instrumentalities, contraband, and

persons to be arrested described herein and in **Attachments B1–B4** at the **Target Structures** and inside of the **Target Vehicles**.

207.    I further request that the Court order that all papers in support of these applications, including the affidavit, search warrants, search warrant returns, and Order granting sealing be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation. Additionally, it is requested that these documents be disclosed as necessary for any discovery in criminal prosecutions without unsealing.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Abigail Tarwater
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me via telephone or other reliable electronic means on this
25th _____ day of September 2023.    Sworn to by telephone
10:03 AM, Sep 25, 2023

_____
HONORABLE LAJUANA M. COUNTS
United States Magistrate Judge
Western District of Missouri



60